Matter of Hussain v Lynch (2023 NY Slip Op 02049)

Matter of Hussain v Lynch

2023 NY Slip Op 02049

Decided on April 20, 2023

Appellate Division, Third Department

Ceresia, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 20, 2023

CV-22-2123

[*1]In the Matter of Nauman Hussain, Petitioner,
v
Peter Lynch, as Supreme Court Justice, Respondent.

Calendar Date:February 22, 2023

Before: Garry, P.J., Egan Jr., Aarons, Reynolds Fitzgerald and Ceresia, JJ.

Tacopina Seigel & DeOreo, New York City (Chad Seigel of counsel) and The Kindlon Law Firm, PLLC, Albany (Lee C. Kindlon of counsel), for petitioner.

Ceresia, J.
Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to CPLR 506 [b] [1]) to, among other things, compel respondent to reinstate petitioner's plea of guilty of the crime of criminally negligent homicide (20 counts).
Petitioner was charged by indictment with 20 counts of manslaughter in the second degree (see Penal Law § 125.15 [1]) and 20 counts of criminally negligent homicide (see Penal Law § 125.10), stemming from an October 2018 incident in Schoharie County during which a stretch limousine owned by petitioner's company sustained a catastrophic brake failure, resulting in a crash that killed the driver, 17 passengers and two pedestrians. In September 2021, the People and petitioner entered into a written plea agreement, pursuant to which petitioner, in full satisfaction of the indictment and subject to court approval, agreed to plead guilty to 20 counts of criminally negligent homicide. In accordance with the plea resolution, petitioner was to be placed on two years of interim probation, during which he was required to complete a total of 1,000 hours of community service. Upon the successful completion of this term of interim probation, petitioner would be sentenced to five years of probation, with credit for the two years served on interim probation, resulting in a remaining period of three years of probation to be served post-sentencing. As set forth in special probation conditions, petitioner would not be permitted to work for any commercial transportation business, and his probation would not terminate early. On September 2, 2021, County Court (Bartlett III, J.) accepted petitioner's guilty plea and placed him on interim probation.
Judge Bartlett subsequently retired, and the case was reassigned to respondent in July 2022. During an appearance before respondent on August 24, 2022, both petitioner and the People conceded that a second year of interim probation was not permissible under the law, as petitioner was not "participating in a treatment program in connection with a court designated a treatment court," a statutory prerequisite to a second year of interim probation (CPL 390.30 [6] [a]). Accordingly, and as petitioner was nearing the end of his first year of interim probation, respondent scheduled sentencing for one week hence. On August 31, 2022, the date of the anticipated sentencing, respondent, finding the plea agreement "fundamentally flawed" and "not based on truth," advised petitioner that he would not abide by the agreement. In reaching this conclusion, respondent stated, among other things, that the plea agreement failed to sufficiently account for evidence suggesting that petitioner had removed an out-of-service sticker from the limousine shortly before the accident, which respondent viewed as an act consistent with the crime of manslaughter in the second degree and inconsistent with the crime of criminally negligent homicide.
Respondent then informed petitioner that he intended to sentence him that [*2]day to the maximum allowable term of imprisonment — 1&frac13; to 4 years — for each count to which he had pleaded guilty (see Penal Law § 70.00 [2] [e]; [3] [b]).[FN1] Prior to imposing that sentence, however, respondent afforded petitioner an opportunity to confer with counsel to decide whether he wished to move forward or, instead, withdraw his guilty plea. When sentencing proceedings resumed approximately 20 minutes later, and after respondent denied petitioner's request for additional time to assess the situation, petitioner's counsel stated that, "[i]n light of the [c]ourt's position, [petitioner is] impelled" to seek vacatur of the plea, a request that respondent granted. As a result, respondent scheduled the matter for trial on May 1, 2023, prompting petitioner to commence this CPLR article 78 proceeding seeking reinstatement of his guilty plea and the imposition of a sentence in compliance with the plea agreement. For the following reasons, the petition must be dismissed.
To begin with, mandamus to compel does not lie. Mandamus to compel is an extraordinary remedy, commanding "an officer or body to perform a specified ministerial act that is required by law to be performed. It does not lie to enforce a duty that is discretionary" (Alliance to End Chickens as Kaporos v New York City Police Dept., 152 AD3d 113, 117 [1st Dept 2017] [citation omitted], affd 32 NY3d 1091 [2018], cert denied ___ US ___, 139 S Ct 2651 [2019]; see Matter of Meyer v Zucker, 185 AD3d 1265, 1266 [3d Dept 2020], lv denied 36 NY3d 904 [2021]). "A ministerial act is best described as one that is mandated by some rule, law or other standard and typically involves a compulsory result" (Alliance to End Chickens as Kaporos v New York City Police Dept., 152 AD3d at 117 [citation omitted]). "Mandamus is not available to compel an officer or body to reach a particular outcome with respect to a decision that turns on the exercise of discretion or judgment. In other words, mandamus will lie to compel a body to perform a mandated duty, not how that duty shall be performed" (id.; see Klostermann v Cuomo, 61 NY2d 525, 539-540 [1984]). "A discretionary act 'involves the exercise of reasoned judgment which could typically produce different acceptable results[,] whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result' " (Matter of Willows Condominium Assn. v Town of Greenburgh, 153 AD3d 535, 536 [2d Dept 2017] [brackets and citation omitted], quoting Tango v Tulevech, 61 NY2d 34, 41 [1983]).
Fundamentally, "[i]mposing a criminal sentence is never ministerial" (People v Reyes, 72 Misc 3d 1133, 1140 [Sup Ct, NY County 2021]; see Matter of Kurz v Justices of Supreme Ct. of N.Y., Kings County, 228 AD2d 74, 77 [2d Dept 1997]; see also People v White, 141 AD3d 463, 464 [1st Dept 2016], lv denied 28 NY3d 975 [2016]). Indeed, "a trial court always 'retains discretion in fixing an appropriate sentence up until the time of the sentencing' " (People [*3]v Muhammad, 132 AD3d 1068, 1069 [3d Dept 2015], quoting People v Schultz, 73 NY2d 757, 758 [1988]). "[T]he necessary exercise of discretion cannot be fixed immutably at the time of the plea, for the decision requires information that may be unavailable then" (People v Farrar, 52 NY2d 302, 306 [1981]). At the time of sentencing, the court must consider "the crime charged, the particular circumstances of the individual before the court and the purpose of a penal sanction, i.e., societal protection, rehabilitation and deterrence," all while remaining "detached from outside pressures often brought to bear on the prosecution and defense" (id. at 305-306). Due to the inherently discretionary nature of sentencing, a criminal defendant is not entitled to a writ of mandamus to compel the trial court to sentence him or her in accordance with a plea agreement, so long as " 'the reasons for departing from the sentencing agreement are placed upon the record to ensure effective appellate review of the sentencing court's exercise of discretion,' " as was done in this case (Matter of Kurz v Justices of Supreme Ct. of N.Y., Kings County, 228 AD2d at 77 [brackets omitted], quoting People v Schultz, 73 NY2d at 758).
It is petitioner's position that respondent was mandated to impose the bargained-for sentence, retaining no discretion whatsoever, because petitioner was entitled to specific performance of the plea agreement due both to his detrimental reliance upon it as well as respondent having had no new information before him to justify his decision not to impose the sentence of probation. However, petitioner fails to recognize that respondent, in deciding whether to honor the negotiated sentence, necessarily exercised his discretion and judgment. That is, a determination such as the one rendered by respondent required consideration, under the unique facts and circumstances of the case, of whether petitioner had detrimentally relied upon the plea agreement — including analysis of the nature and extent of any services performed by petitioner — whether there was any new information that rendered the promised sentence improvident, whether a reassessment of the case and the contemplated disposition justified deviating from the sentence, or whether other compelling reasons existed to warrant a different outcome. Stated another way, because respondent was under no obligation to merely "rubber stamp" the probation sentence, the mandamus relief being sought by petitioner is unavailable.
That said, petitioner's argument concerning respondent's authority may readily be construed as seeking a writ of prohibition, notwithstanding the nomenclature of his application.[FN2] We therefore next consider whether "the issue presented is the type for which the remedy may be granted" (Matter of Holtzman v Goldman, 71 NY2d 564, 568 [1988]). Although it is well established "that prohibition will not lie as a means of seeking collateral review of mere trial errors of substantive law or procedure[*4], however egregious the error may be" (Matter of Rush v Mordue, 68 NY2d 348, 353 [1986]; see Matter of Holtzman v Goldman, 71 NY2d at 569), "there is no sharp line between a court acting in error under substantive or procedural law and a court acting in excess of its powers, if only because every act . . . in excess of [a court's] powers in a proceeding over which it has jurisdiction of necessity involves an 'error of law' " (La Rocca v Lane, 37 NY2d 575, 580 [1975], cert denied 424 US 968 [1976]; see Matter of Rush v Mordue, 68 NY2d at 353). In our view, the alleged excess of authority here is of the sort that would "impact . . . the entire proceeding" (Matter of Holtzman v Goldman, 71 NY2d at 569), and could indeed implicate the legitimacy of any trial to come. Thus, petitioner's choice to test the court's power to vacate his lawfully entered plea via this CPLR 7801 proceeding was a correct one (see Matter of Moran v Daley, 12 AD3d 1074, 1075 [4th Dept 2004]; Matter of Randolph v Leff, 220 AD2d 281, 281 [1st Dept 1995]; People v Pacheco, 152 AD2d 641, 641 [2d Dept 1989], lv denied 74 NY2d 850 [1989]; see also Matter of Pirro v Angiolillo, 89 NY2d 351, 355-356 [1996]; Matter of Kisloff v Covington, 73 NY2d 445, 449 [1989]). Further, while petitioner could proceed to trial and, upon a conviction, raise his specific performance argument on a direct appeal, "prohibition would furnish a more complete and efficacious remedy," and the technical availability of another means of redress does not preclude the writ if an "appeal or proceedings would be inadequate to prevent the harm" (La Rocca v Lane, 37 NY2d at 579-580).[FN3]
Although petitioner thus has an appropriate procedural vehicle for his claim, a review of the merits leads us to conclude that the issuance of a writ is unwarranted (see Matter of Holtzman v Goldman, 71 NY2d at 568). A "defendant [is not] entitled to specific performance of [a] plea bargain unless he [or she has] been placed in a 'no-return position' in reliance on the plea agreement" (People v Bonville, 69 AD3d 1223, 1224 [3d Dept 2010], quoting People v McConnell, 49 NY2d 340, 345 [1980]). A no-return position occurs "where the defendant not only waives his [or her] right to trial, but performs other services for the prosecutor as well, services that involve considerable risk or sacrifice" (Chaipis v State Liq. Auth., 44 NY2d 57, 65 [1978]; accord People v McConnell, 49 NY2d at 348; see People v Rubendall, 4 AD3d 13, 19 [2d Dept 2004]). In our view, such circumstances are not present here.
Petitioner's primary argument in support of his claim of detrimental reliance is that he completed 572.5 hours of community service. Even overlooking the fact that the plea agreement required petitioner to perform 1,000 hours before being entitled to a sentence of probation, we find that petitioner has failed to establish that the hours that he did complete constitute detrimental reliance. The record reveals that petitioner performed his community [*5]service at a food bank, a food pantry and a community center over the course of approximately one year, which would translate to an average of approximately 11 hours per week had petitioner regularly dedicated himself to these tasks. To the contrary, however, petitioner did not perform these hours in a consistent fashion. While it is true that petitioner's time sheets indicate that he worked a number of full days, there were also large stretches of time when he performed no work at all. For example, petitioner worked just eight days in November 2021, seven days in December 2021, four days in February 2022, two days in March 2022, six days in May 2022, three days in June 2022, five days in July 2022 and four days in August 2022. As such, we reject petitioner's claim that his performance of service to his community was a significant imposition on his time and life or was of such magnitude that it rose to the level of detrimental reliance. In that regard, it is telling that, as set forth in the presentence investigation report, petitioner "has a lack of positive commitments, life goals, commitment and interest in a career or job, and future aspirations. His daily existence is characterized by idleness and boredom." Thus, although the total number of hours of service expended by petitioner may seem consequential upon first glance, further reflection divulges that, under these specific circumstances, the time and service given by him not only was not unduly burdensome, but also certainly did not involve the type of considerable risk or sacrifice that placed him in a no-return position (see People v Rubendall, 4 AD3d at 19; but see People v Matyjewicz, 80 AD3d 779, 779-780 [2d Dept 2011]).
We additionally find unavailing petitioner's claim that he detrimentally relied upon the plea bargain by waiving his Fifth Amendment privilege and testifying in a deposition in connection with pending civil litigation relating to the limousine accident. Respondent has ruled that no such testimony would be admissible in any form during the criminal trial, including as direct evidence or for impeachment purposes. To the extent that petitioner may have made admissions that could be used against him in the civil litigation, we need only point out that, following resolution of the criminal case, he would be required to subject himself to a deposition in the civil matter in any event. Moreover, with respect to the idea that petitioner, in giving a civil deposition, committed himself to a certain version of events, " 'neither the text nor the spirit of the Fifth Amendment confers a privilege to lie' " (Matter of Mathis [Commissioner of Labor], 110 AD3d 1412, 1413 [3d Dept 2013], lv denied 23 NY3d 902 [2014], quoting Brogan v United States, 522 US 398, 404 [1998]). As for petitioner's further argument that he agreed, to his detriment, to remain on electronic monitoring for an extended period of time, we do not ascribe any meaningful significance to this fact.
Nevertheless[*6], assuming arguendo that petitioner had demonstrated detrimental reliance, it bears acknowledging that a sentencing court is empowered to depart from a plea bargain where there are "compelling reasons requiring a different result" (People v Danny G., 61 NY2d 169, 176 [1984]; accord People v Rubendall, 4 AD3d at 19). To that end, if a case contemplating a probationary sentence in the face of an admission of guilt relative to a horrific vehicular accident resulting in 20 violent deaths does not present compelling reasons for a court to reconsider and ultimately insist on a deviation in sentence, then it is difficult, if not altogether impossible, to imagine a case that does. Although we do not quarrel with the dissent's position that predictability is an important benefit of the plea-bargaining process, that cannot outweigh a judge's discretion to determine whether a plea bargain is unjust under the circumstances and, if so, take appropriate corrective action — something that is vital to society's confidence in the criminal justice system.
Having rejected petitioner's detrimental reliance argument, we now consider his claim that he is entitled to specific performance of the plea agreement because there was no new information presented to respondent prior to sentencing. Petitioner's argument is unpersuasive in a number of respects. First, in the absence of detrimental reliance on a plea bargain, "if the court will not or cannot impose the sentence promised, and the defendant does not wish to agree to the imposition of a different sentence, he [or she] is entitled to no more than the withdrawal of his [or her] plea of guilty" (People v Rubendall, 4 AD3d at 19; see People v Abare, 124 AD3d 1075, 1076 [3d Dept 2015], lv denied 25 NY3d 1197 [2015]). As such, specific performance is not the proper remedy.
Second, there indeed was new information before respondent that was not available to Judge Bartlett at the time of the plea. A sentencing court is entitled to rely on new information in determining whether to abide by a plea agreement, including information contained in a presentence investigation report (see People v Sanchez, 87 AD3d 1226, 1226 [3d Dept 2011], lv denied 18 NY3d 928 [2012]; People v Herber, 24 AD3d 1317, 1318 [4th Dept 2005], lv denied 6 NY3d 814 [2006]). Here, as respondent noted, petitioner had not completed the full 1,000 hours of community service, as required by the plea agreement, and the presentence investigation report not only declined to recommend sentencing in accordance with the agreement but, to the contrary, stated that there should be "accountability" and indicated that sentencing should be left to the discretion of the court. To that new information, we would add that respondent accepted victim impact statements from multiple family members of the victims, who detailed the tortuous and devastating effects of the crimes upon them and conveyed in no uncertain terms that they were angered by and unsupportive of the plea [*7]resolution.[FN4] In that regard, the sentencing court is required to consider "the views of the victim relating to disposition," or the views of the victim's family in the event of a homicide (CPL 390.30 [3] [b]), and a review of such victim impact statements may "provide[ ] a sufficient basis for the court to depart from the original sentencing promise" (People v Jones, 287 AD2d 741, 742 [2d Dept 2001] [internal quotation marks and citation omitted], lv denied 97 NY2d 706 [2002]). In light of the foregoing, we are satisfied that new information was presented to respondent to justify his decision not to abide by the plea bargain and to permit defendant to withdraw his plea (see People v Tesiero, 184 AD2d 802, 802-803 [3d Dept 1992], lv denied 80 NY2d 934 [1992]).
Third, even in the absence of new information brought to light since the time of the plea, it must be emphasized that a sentencing court may still choose to decline to adhere to a plea bargain, and is "entitled to make such a determination entirely upon its reconsideration of facts already available at the time of the original offer" (People v Sherwood, 28 AD3d 259, 260 [1st Dept 2006], lv denied 7 NY3d 763 [2006]; see People v Schultz, 73 NY2d at 758; People v Bonville, 69 AD3d at 1224; People v Fludd, 137 AD2d 764, 765 [2d Dept 1988], lv denied 71 NY2d 1026 [1988]). We find no fault with respondent's discretionary review of the case and determination that evidence supported an inference that it was petitioner who removed the out-of-service sticker from the limousine prior to the accident and, further, that the removal of the sticker evinced an awareness of and conscious disregard for a risk to human life, consistent with manslaughter in the second degree, as opposed to a failure to perceive such risk, consistent with criminally negligence homicide. Despite the fact that the parties stipulated that the out-of-service sticker had been placed on the vehicle for reasons other than brake failure, we note that evidence of the sticker's removal could nevertheless arguably support the notion that, but for such removal, the limousine would not have been on the road in the first place. Petitioner's remaining contentions have been examined and found to be without merit.
Garry, P.J., Egan Jr. and Reynolds Fitzgerald, JJ., concur.
Aarons, J. (dissenting).
A writ of mandamus or a writ of prohibition is an extraordinary remedy reserved for extraordinary circumstances. In my view, this is one of those extraordinary instances warranting intervention in a collateral proceeding such that petitioner should be granted a writ. Accordingly, I respectfully dissent.
The operative facts are largely not contested. How they were viewed, however, is at the center of this dispute. In a separate criminal proceeding, petitioner was charged in a 40-count indictment stemming from an incident in 2018 where a limousine owned by petitioner's company and operated by an employee crashed, resulting in multiple fatalities[*8]. After extensive negotiations, petitioner would agree to plead guilty to 20 counts of criminally negligent homicide in satisfaction of the indictment and the People would recommend a sentence of five years of probation. Under the terms of the plea agreement, County Court (Bartlett III, J.) would place petitioner, upon his guilty plea, on a two-year period of interim probation, with conditions, after which time petitioner would then be sentenced to the promised five-year probationary term with credit to be applied to that term. During the two-year interim probationary period, petitioner would be required to, among other things, perform 1,000 hours of community service. This community service was to be completed in increments of 125 hours every three months.
In September 2021, petitioner pleaded guilty as agreed upon by him and the People and as contemplated by the plea agreement. At the plea hearing, County Court considered the victim impact statements and noted, "It just does not seem right that 20 people are dead and [petitioner] receives a sentence of probation and community service." Nonetheless, in accepting the guilty plea, the court stated that "[i]t is not something [done] lightly" and that "many hours of thought" were devoted to it. The court expressed that the People and petitioner "both . . . [sought] an assured resolution to guarantee finality in this highly emotional case, for the benefit of all touched by the tragedy at the center of it." The court also remarked that the "recommended sentence was the result of much careful thought and . . . [was] recommended by the District Attorney."[FN5]
Prior to sentencing, Judge Bartlett retired, and the matter was assigned to respondent in July 2022. The parties in the criminal proceeding then appeared before respondent on August 24, 2022, for the purposes of a control date appearance. At this appearance, respondent advised the parties that a two-year period of interim probation that was agreed to was not permissible under the pertinent statute. The People did not dispute this, acknowledged that petitioner was "not only in compliance but has exceeded the requirements that were placed on him" and consented to go forward with sentencing. Petitioner likewise agreed to proceed with sentencing. Respondent stated that "[i]t does appear that [petitioner has] been in compliance with the conditions" and otherwise did not indicate any other infirmities with the plea agreement. Respondent scheduled sentencing for one week later, on August 31, 2022.
At the sentencing hearing, the People requested that "the [c]ourt accept the plea agreement . . . outlined a year ago" and "sentence [petitioner] pursuant to that agreement." Petitioner joined in that request, noting that "all of the compelling and mitigating circumstances justifying the sentence ha[ve] been set forth in the plea agreement." Notwithstanding their similar requests, respondent advised them that he would not abide by the plea agreement on the basis [*9]that the agreement was "fundamentally flawed" and "not based on truth." In view of this, respondent further advised petitioner that, if he did not wish to withdraw his plea, respondent intended to sentence him immediately to the maximum allowable term of imprisonment. Respondent then afforded petitioner about 20 minutes to decide whether to withdraw his guilty plea. After the conclusion of that time period, petitioner's counsel requested more time to make a decision, to which respondent stated, "I want your decision." Counsel responded, "In light of the [c]ourt's position, we're impelled today to seek to vacate [petitioner's] plea." Respondent granted this request and scheduled the matter for trial. Petitioner commenced this CPLR article 78 proceeding in this Court seeking a writ to obtain specific performance of the plea agreement and to compel respondent to reinstate the guilty plea and sentence him to the agreed-upon sentence.
The record reflects that, in the criminal proceeding, petitioner and the People apparently felt that avoiding a trial and resolving such proceeding through plea bargaining was the best course of action for everyone involved. The plea agreement reached between them, and with the aid of County Court, was a product of extensive negotiations, give and take and multiple revisions over the course of many, many months. In view of the events leading to the indictment, it would be of no surprise if the parties in the criminal proceeding, as well as those individuals indirectly impacted by the plea agreement, did not feel completely and wholly satisfied with the agreement reached. Indeed, before ultimately giving its blessing to the plea agreement, the court, itself, expressed a degree of reservation with the fact that petitioner would not be serving time in prison.
What is surprising is that the plea agreement was eviscerated in a fleeting moment. What is troubling are the circumstances of its undoing. It was undone at the last possible instant and contrary to the request by the parties in the criminal proceeding who had tirelessly worked to come to a mutual agreement. It was undone by respondent, who stated, "I am the [s]entencing [c]ourt and it is my determination that governs this sentencing." This is not to suggest that respondent, in his capacity as the judge newly designated to preside over petitioner's criminal proceeding, was resigned to the sole task of imposing the sentence contemplated in the plea agreement. Respondent could deviate from what the plea agreement contemplated regarding the sentence provided that new information came to light warranting such deviation (see e.g. People v Herber, 24 AD3d 1317, 1318 [4th Dept 2005], lv denied 6 NY3d 814 [2006]). Moreover, to do so, it was incumbent upon respondent to state the reasons on the record to ensure effective appellate review (see People v Schultz, 73 NY2d 757, 758 [1988]).
Respondent did give reasons on the record. Although respondent heard victim impact statements[*10], as County Court did, those statements did not form the basis of respondent's determination. Respondent premised his determination on the fact that an out-of-service sticker that was originally on the limousine at issue was removed. Respondent stated that the sticker was ultimately "discovered in the search of [petitioner's] vehicle and that as a result of DNA testing, that [petitioner's] DNA was on that sticker." From this, respondent himself inferred that the sticker was "consciously removed." According to respondent, this was an act consistent with the crime of manslaughter in the second degree, not criminally negligent homicide, and, therefore, rendered the plea agreement "completely disingenuous and unacceptable." Petitioner's counsel noted that this fact was considered, to which respondent remarked, "I am completely unimpressed."
As the majority notes, it is within a court's discretion to impose an appropriate sentence up until the time of sentencing (see People v Schultz, 73 NY2d at 758; People v Sheckton, 239 AD2d 617, 618 [3d Dept 1997]). To that end, a writ of mandamus generally does not lie to review discretionary matters in criminal cases (see Matter of Carty v Hall, 92 AD3d 1191, 1192 [3d Dept 2012]; Matter of Barnwell v Breslin, 46 AD3d 990, 991 [3d Dept 2007]; Matter of Bloom v Clyne, 69 AD2d 956, 956 [3d Dept 1979]). Despite the foregoing, "mandamus . . . will lie to compel performance of those acts which are mandatory but are executed through means that are discretionary" (Matter of Schroedel v LaBuda, 264 AD2d 136, 138 [3d Dept 2000] [internal quotation marks and citation omitted], lv denied 95 NY2d 754 [2000], cert denied 531 US 860 [2000]).
The majority posits that respondent necessarily exercised his discretion and judgment in determining whether to honor the plea agreement. A careful review of respondent's reasons, however, reveals to the contrary. Respondent did not engage in a discretionary determination upon the receipt of new information. Instead, respondent injected and substituted his own judgment for that of what was essentially a court of coordinate jurisdiction. This is where the abuse of power lies. It took respondent one week — i.e., from the control date appearance when petitioner, the People and respondent acknowledged that petitioner was in compliance with the applicable conditions to the sentencing hearing — to conduct his own review of the already-known facts and come to his own conclusion about them, all with little or no input from the relevant parties. This was a fraction of the amount of time that it took the parties in the criminal proceeding to reach an agreement. Furthermore, although respondent viewed certain facts differently than how County Court did, this does not mean that such facts were not given its due consideration prior to the acceptance of petitioner's guilty plea. The different interpretation by respondent as to the gravity of the removal of the inspection sticker from the limousine also [*11]does not render the plea agreement "fundamentally flawed" or "completely disingenuous." Because what respondent considered at sentencing was not new information, the decision to dishonor the plea agreement did not result from the exercise of any discretionary judgment. More to the point, in the absence of new information, only one act remained — the imposition of the agreed-upon sentence in the plea agreement (see People v Powers, 134 AD2d 736, 736 [3d Dept 1987]; People v Jones, 99 AD2d 1, 3-4 [3d Dept 1984]; compare People v Abare, 124 AD3d 1075, 1076 [3d Dept 2015], lv denied 25 NY3d 1197 [2015]).
Of course, "[b]efore sentence is imposed, trial courts in criminal cases have the general inherent authority to correct their own mistakes" (Matter of Van Leer-Greenberg v Massaro, 87 NY2d 996, 998 [1996] [citations omitted]). The wrinkle here, however, is that respondent was not correcting a mistake of his own doing. Notably, respondent made it painstakingly clear that the "plea agreement [was] between the parties" and not him. In spite of divorcing himself from any involvement in the creation of the plea agreement, respondent nonetheless sought to correct what he perceived to be a mistake made by another trial-level judge.[FN6] This is where another abuse of power lies — respondent was exercising power that was to be exercised by an appellate court and not by him.
That said, "where the lower court is exceeding its jurisdiction and the writ . . . furnishes a more effective remedy, it may be availed of although the error might be corrected by appeal" (Matter of Lee v County Ct. of Erie County, 27 NY2d 432, 437 [1971] [internal quotation marks and citation omitted], cert denied 404 US 823 [1971]). Although rare, a writ of prohibition is permissible when there is "a gross abuse of power on its face and in effect may be in reality so serious an excess of power incontrovertibly justifying and requiring summary correction" (Matter of La Rocca v Lane, 37 NY2d 575, 580 [1975], cert denied 424 US 968 [1976]). Because respondent acted in excess of a trial-level court's jurisdiction, substituted his own judgment for that of another trial-level judge and did not engage in any discretionary actions, a writ lies to direct specific performance of the plea agreement.
Also not to be overlooked is the 572½ hours of community service performed by petitioner. According to petitioner, specific performance of the plea agreement is necessary because he cannot be restored to his preplea status in view of these hours expended and that merely withdrawing his plea is not an adequate remedy. "[W]here the defendant not only waives [the] right to trial, but performs other services for the prosecutor as well, . . . merely undoing the plea is small compensation, if any" (People v McConnell, 49 NY2d 340, 348 [1980] [internal quotation marks, emphasis and citation omitted]; see People v Danny G., 61 NY2d 169, 175-176 [1984]; see e.g. People v Matyjewicz, 80 AD3d 779, 780 [2d Dept 2011[*12]]). During oral argument, the parties debated how many hours of performed community service pushed petitioner beyond the point of not being able to be returned to his preplea status. There can be no specific quantification, percentage or threshold, however, to assess what amount of hours constitutes a satisfactory performance of services given that specific performance of a plea agreement is ordered, in part, "as a matter of essential fairness" (People v McConnell, 49 NY2d at 349).[FN7]
Unfortunately, what may be a fair result for one party may be viewed as unfair to others. This case presents no exception from that notion, in view of the varying opinions as to whether the plea agreement and the recommended sentence therein were fair. Despite this, the parties, the bar, the public and society must be assured that any final result in the plea-bargaining process was reached fairly. To that end, "the guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system. Properly administered, they can benefit all concerned" (Bordenkircher v Hayes, 434 US 357, 361-362 [1978] [internal quotation marks and citation omitted; emphasis added]; see People v Seaberg, 74 NY2d 1, 7 [1989]). Plea bargaining "enables the parties to avoid the delay and uncertainties of trial and appeal and permits swift and certain punishment of law violators with sentences tailored to the circumstances of the case at hand" (People v Allen, 86 NY2d 599, 602 [1995] [internal quotation marks and citation omitted]; see People v Avery, 85 NY2d 503, 506-507 [1995]).
What the parties in the criminal proceeding mutually agreed to, with County Court's assistance, stemmed from their dedication to bringing finality to just one facet of a devasting car crash. More importantly, it exemplified the proper administration of the plea-bargaining process. "Only rigorous adherence by the courts to a policy of affording guilty pleas a great measure of finality will immunize plea negotiations from indiscriminate potshots" (People v Frederick, 45 NY2d 520, 525 [1978]; see People v Francis, 38 NY2d 150, 155 [1975]). If a writ is not granted and the manner in which the plea agreement was dismantled in the criminal proceeding is deemed permissible, the sanctity of that great measure of finality fades and erodes. What happened in the criminal proceeding tells the criminally accused and the prosecutors who engage in good-faith negotiations that, when a new trial-level judge is assigned prior to the imposition of sentence, no plea agreement is safe because that judge can simply discard the agreement on the mere basis that he or she viewed the facts differently. What happened undermines society's trust and belief in the plea-bargaining process — a process that is "a vital part of our criminal justice system" (People v Seaberg, 74 NY2d at 7).
For all of these reasons, I would grant the petition, order specific performance of the plea agreement and direct respondent [*13]to reinstate petitioner's guilty plea and sentence petitioner in accordance with the plea agreement.
ADJUDGED that the petition is dismissed, with costs.

Footnotes

Footnote 1: There is no dispute that the 20 sentences would be required to run concurrently (see Penal Law § 70.25 [2]; People v Muniz, 193 AD3d 1116, 1119 [3d Dept 2021], lv denied 37 NY3d 967 [2021]).

Footnote 2: "[CPLR a]rticle 78 first appeared on the legal landscape in 1937 as part of the Civil Practice Act. Practice under then-existing procedures for certiorari, mandamus and prohibition had proven to be at odds with modern notions of procedural fairness," as dismissal might occur based solely upon a proceeding being brought under the wrong heading (Vincent C. Alexander, Prac Commentaries, McKinney's Cons Laws of NY, CPLR C7801:1 [internal citation omitted]). Today, a petitioner in a CPLR article 78 proceeding " 'need only set forth his [or her] facts and his [or her] prayer for relief and such relief as is proper may be given to him [or her]' " (Vincent C. Alexander, Prac Commentaries, McKinney's Cons Laws of NY, CPLR C7801:1, quoting NY Jud Council, Fourth Ann Rep 19 [1938]).

Footnote 3: We believe that it would be fundamentally unfair, and indeed inexcusable, to require petitioner, the prosecution, respondent and the families of the victims to have to endure the stresses of a trial, to say nothing of the resources that would have to be expended, with this issue unnecessarily hanging unresolved over their collective heads.

Footnote 4: Of the five family members who spoke at the proceeding that was scheduled for sentencing, two of them were speaking to the court for the first time. While the other three had spoken to Judge Bartlett at the time of the plea, their statements to respondent were not identical and were made from the perspective of an additional year having passed.

Footnote 5: The reasoning that County Court articulated on the record was also embodied in a written statement in excess of 20 pages.

Footnote 6: Seemingly, the mistake in respondent's view was the lack of prison time in the plea agreement — a fact that County Court had deemed acceptable. To remedy this, respondent, as mentioned, did not consider new information but essentially acted as a juror by characterizing petitioner's actions as being consistent with the crime of manslaughter in the second degree to justify a term of imprisonment. Recognizing that he could not legally impose the prison term that he desired at the sentencing hearing, respondent gave petitioner a choice. The approximately 20 minutes of time that respondent gave, however, was miniscule compared to the amount of time that petitioner was under the impression that the plea agreement was valid and would be enforced. Without being provided additional time, as petitioner's counsel requested, the withdrawal of the plea was not an intelligent choice, let alone, a choice. Rather, petitioner's counsel aptly described it as petitioner being "impelled" to do so.

Footnote 7: In any event, the pace required by the September 2021 plea agreement — 125 hours every three months — amounts to 500 hours in one year. By the August 2022 control date appearance, however, petitioner had exceeded that pace and completed more than 500 hours of community service, as recognized by the People and respondent. Had the interim probationary period continued for another year as petitioner and the People originally envisioned, it is reasonable to conclude that petitioner would have satisfied the 1,000-hour requirement.